JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel:  858-623-4200
Fax: 858-623-4299

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FENELLA ARNOLD, KELLY NAKAI, and MICHELE RUPPERT, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> HEARST MAGAZINE MEDIA, INC., a Delaware corporation; CDS GLOBAL, INC., an Iowa corporation; and DOES 1-50, inclusive, <br><br> Defendants. | CASE NO. 3:19-cv-01969-WQH-MDD <br><br> CLASS ACTION <br><br> SECOND AMENDED COMPLAINT FOR: <br><br> (1) FALSE ADVERTISING [Bus. & Prof. Code § 17600 et seq. and § 17535] <br><br> (2) VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT [Civ. Code § 1750 et seq.] <br><br> (3) VIOLATION OF THE UNFAIR COMPETITION LAW [Bus. & Prof. Code § 17200 et seq.] <br><br> (4) UNJUST ENRICHMENT <br><br> DEMAND FOR JURY TRIAL |

1

## **INTRODUCTION**

2      1.      This class action complaint alleges that defendants Hearst Magazine

3  Media, Inc. ("Hearst") and CDS Global, Inc. ("CDS") violate California law in

4  connection with magazine marketing and subscription programs.   Among other

5  things, Hearst and CDS work together to enroll consumers in automatic renewal

6  subscriptions without providing the "clear and conspicuous" disclosures mandated by

7  California law; post charges to consumers' credit or debit cards for purported

8  automatic renewal subscriptions without first obtaining the consumers' affirmative

9  consent to an agreement containing the requisite clear and conspicuous disclosures;

10  and solicit payment of money for goods that consumers did not order by sending

11  "invoices" for amounts that are not actually owed.   Defendants' conduct constitutes

12  false advertising, based on violation of the California Automatic Renewal Law (Bus.

13  & Prof. Code § 17600 et seq.) ("ARL"); violates the Consumers Legal Remedies Act

14  (Civ. Code § 1750 et seq.) ("CLRA"); and violates the Unfair Competition Law (Bus.

15  & Prof. Code § 17200 et seq.) ("UCL").[1]   Unless otherwise indicated, all statutory

16  citations herein are to the California Business and Professions Code.

17

## **THE PARTIES**

18      2.      Plaintiff Fenella Arnold ("Arnold") is an individual residing in San

19  Diego County, California.

20      3.      Plaintiff Kelly Nakai ("Nakai") is an individual residing in San Diego

21  County, California.

22      4.      Plaintiff Michele Ruppert ("Ruppert") is an individual residing in San

23  Diego County, California.

24  _____

25  [1] On June 25, 2020, the Court entered an Order (ECF No. 20) granting Defendants'
motion to dismiss Plaintiffs' First Amended Complaint ("FAC").   Among other

26  things, the Order dismissed plaintiff Kelly Nakai's claim for relief alleging that
Defendants violated California Civil Code § 1716.   While omitting that claim for

27  relief from this Second Amended Complaint, Nakai expressly reserves the right to
appeal the order dismissing that claim for relief.

28

5.     Arnold, Nakai, and Ruppert are collectively referred to herein as "Plaintiffs."

6.     Plaintiffs are informed and believe and thereon allege that defendant Hearst Magazine Media, Inc. is a Delaware corporation that does business in San Diego County, including the marketing of magazine subscriptions.

7.     Plaintiffs are informed and believe and thereon allege that defendant CDS Global, Inc. is an Iowa corporation that does business in San Diego County, including the marketing and processing of magazine subscriptions.

8.     Plaintiffs do not know the names of the defendants sued as DOES 1 through 50 but will amend this complaint when that information becomes known. Plaintiffs allege on information and belief that each of the DOE defendants is affiliated with one or more of the named defendants in some respect and is in some manner responsible for the wrongdoing alleged herein, either as a direct participant, or as the principal, agent, successor, alter ego, or co-conspirator of or with one or more of the other defendants.  For ease of reference, Plaintiffs will refer to the named defendants and the DOE defendants collectively as "Defendants."

## JURISDICTION AND VENUE

9.     Defendants Hearst and CDS Global removed the action to this Court from the San Diego County Superior Court on October 10, 2019.  *See* Dkt. No. 1.

10.     Venue is proper in this judicial district because the complained of conduct occurred in San Diego County and the liability arose in San Diego County.

## BACKGROUND

11.     Hearst is one of the largest magazine publishers in the world.  In the United States, Hearst publishes approximately two dozen magazine titles, including *Food Network*, *Cosmopolitan*, *Good Housekeeping*, *Woman's Day*, *Country Living*, *HGTV Magazine*, and *Car & Driver*.

12.     CDS is the largest magazine fulfillment house in the United States.  As a fulfillment house, CDS works with magazine publishers to provide services that

may include assisting with subscriptions, billing, collection, and/or other account services.  Based in Des Moines, Iowa, CDS is a wholly-owned subsidiary of Hearst, and provides fulfillment services for Hearst as well as for other magazine publishers.

13.     Traditionally, magazine publishers sold subscriptions on the basis of a schedule that reflects a fixed price for a definite term (such as one, two, or three years).  Under that arrangement, the consumer selects the desired price/term combination and submits payment.  Later, when the end of the term is approaching, the consumer is notified that the subscription will soon come to an end and is provided with a renewal offer.  If the consumer wishes to renew, he or she selects the desired price/term combination for the renewal period and submits the corresponding payment.  Alternatively, if the consumer does not renew, the subscription comes to an end.

14.     During the 1990s, some marketers came to view the traditional model as constraint on sales and profits, and advocated instead adoption of a "negative option" model.  In a "negative option," the seller "interpret[s] a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services."  *See* "*Negative Options*," Federal Trade Commission, January 2009, available at https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff/p064202negativeoptionreport.pdf (last accessed July 24, 2020).  Defendants have implemented a negative option model that does not comply with California law.

15.     One aspect of Defendants' negative option model is to solicit orders for magazine subscriptions that purport to be for a fixed period of time (e.g., one year, or two years), whereas upon receipt of an order, Defendants enroll the consumer in a program under which the magazine subscription will be "automatically renewed" for subsequent periods, with corresponding charges posted to the consumer's credit card, debit card, or other payment account.  Defendants enroll consumers in such "automatic renewal" subscriptions without making the clear and conspicuous

disclosures required by California law.

## SUMMARY OF APPLICABLE LAW

### The California Automatic Renewal Law

16.     In 2009, the California Legislature passed Senate Bill 340, which took effect on December 1, 2010 as Article 9 of Chapter 1 of the False Advertising Law. (Bus. & Prof. Code § 17600 *et seq*. (the "ARL").)  SB 340 was introduced because:

> It has become increasingly common for consumers to complain about unwanted charges on their credit cards for products or services that the consumer did not explicitly request or know they were agreeing to. Consumers report they believed they were making a one-time purchase of a product, only to receive continued shipments of the product and charges on their credit card. These unforeseen charges are often the result of agreements enumerated in the "fine print" on an order or advertisement that the consumer responded to.

*See* Exhibit 1.

17.     The Assembly Committee on Judiciary provided the following background for the legislation:

> This non-controversial bill, which received a unanimous vote on the Senate floor, seeks to protect consumers from unwittingly consenting to "automatic renewals" of subscription orders or other "continuous service" offers.  According to the author and supporters, consumers are often charged for renewal purchases without their consent or knowledge. For example, consumers sometimes find that a magazine subscription renewal appears on a credit card statement even though they never agreed to a renewal.

*See* Exhibit 2.

18.     The ARL seeks to ensure that, before there can be a legally-binding automatic renewal or continuous service arrangement, there must first be adequate disclosure of certain terms and conditions and affirmative consent by the consumer. To that end, § 17602(a) makes it unlawful for any business making an automatic renewal offer or a continuous service offer to a consumer in California to do any of the following:

(1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or

purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. (§ 17602(a)(1).)  For these purposes, "clear and conspicuous" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  (§ 17601(c).) The statute defines "automatic renewal offer terms" to mean the "clear and conspicuous" disclosure of the following: (a) that the subscription or purchasing agreement will continue until the consumer cancels; (b) the description of the cancellation policy that applies to the offer; (c) the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known; (d) the length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer; and (e) the minimum purchase obligation, if any.  (§ 17601(b).)

(2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.  (§ 17602(a)(2).)

(3) Fail to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel.  (§ 17602(a)(3).)

19.   Section 17602(b) requires that the acknowledgment specified in § 17602(a)(3) include "a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-

1  effective, timely, and easy-to-use mechanism for cancellation that shall be described

2  in the acknowledgment."

3      20.    If a business sends any goods to a consumer under a purported automatic

4  renewal or continuous service arrangement without first obtaining the consumer's

5  affirmative consent to an agreement containing the "clear and conspicuous"

6  disclosures as specified in the ARL, the goods are deemed to be an unconditional gift

7  to the consumer, who may use or dispose of them without any obligation whatsoever.

8  (§ 17603.)  Violation of the ARL gives rise to restitution and injunctive relief under

9  the general remedies provision of the False Advertising Law, Bus. & Prof. Code

10  § 17535.  (§ 17604(a).)  As well, violation of the ARL gives rise to restitution and

11  injunctive relief under the UCL.

12              **FACTS GIVING RISE TO THIS ACTION**

13  **Kelly Nakai's Transaction**

14      21.    On September 5, 2018, Nakai received an email from Defendants with a

15  subject line of "Last Chance—You could win a trip to a Wine and Food Festival in

16  NYC."  The email contains promotional material relating to a sweepstakes sponsored

17  by Defendants, for which the prize winner will receive tickets for the New York City

18  Wine & Food Festival, round-trip airfare, and lodging.  A true and correct copy of

19  that email is attached hereto as Exhibit 3 and is incorporated herein by reference.

20  Recipients of the email can initiate entry into the sweepstakes by clicking the

21  "ENTER NOW" button.

22      22.    Upon clicking the "ENTER NOW" button, Nakai was presented with a

23  webpage containing additional promotional material for the sweepstakes.  A true and

24  correct copy of a printout of that webpage is attached hereto as Exhibit 4 and is

25  incorporated herein by reference.  The attached copy of Exhibit 4 was submitted to

26  the Court by Defendants on January 22, 2020, with an explanation that it is a "more

27  legible copy" than the version originally submitted by Nakai.  *See* ECF No. 17 at

28  PageID.322.  A portion of that webpage contains fields in which a consumer can enter

7

his or her name, address, and email information to enter the sweepstakes.  Above those fields is a narrative statement, set forth in bold text, that the consumer can "**[f]ill in the fields below to get 1 FREE issue of Food Network Magazine and be automatically entered for your chance to win**."  Farther down the page is a large "SUBMIT" button by which the consumer can submit the sweepstakes entry and the request for the "FREE" issue.

23.   On Exhibit 4, just above the "SUBMIT" button, the following 9-line paragraph of fine-print text appears in type that is smaller than the surrounding text:

**\*Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted service and access; my subscription(s) will be automatically renewed at the end of each subscription term, at the rate(s) then in effect. I authorize you to fulfill my subscription(s) and charge the credit/debit card if provided, or send me a bill if not.  I won't be bothered with any renewal notices, instead, I will receive a clearly marked reminder notice with the then current rate(s) about 30 days prior to charging my credit/debit card or receiving a bill. I may opt out of the automatic renewal at any time by contacting customer service referenced below and receive a refund for all undelivered issues.

24.   On Exhibit 4, the 9-line paragraph of text that appears above the SUBMIT button (which is set forth in paragraph 23, above) does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is smaller than the surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

25.   On Exhibit 4, the 9-line paragraph of text that appears above the SUBMIT button (which is set forth in paragraph 23, above) does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 24, above; (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan

or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

26.   Nakai submitted a sweepstakes entry, which included a request for the "FREE" issue.  Thereafter, Nakai received an issue of *Food Network Magazine*.

27.   On September 8, 2018, Nakai received an email "INVOICE" from Defendants for an 11-issue term subscription to *Food Network Magazine*, stating an amount due of $12.00.  A true and correct copy of that email is attached hereto as Exhibit 5 and is incorporated herein by reference.  Exhibit 5 does not contain any disclosure that a subscription is to be automatically renewed.

28.   After clicking on the "PAY YOUR INVOICE" button, Nakai was directed to an invoice payment form for her account on Defendant's website, where she submitted payment for the invoice with her credit card, in the amount of $12.00.

29.   On September 5, 2018, Nakai received an "Order Confirmation" email from Defendants.  A true and correct copy of that email is attached hereto as Exhibit 6 and is incorporated herein by reference.  Near the bottom of Exhibit 6 the following 6-line paragraph of fine-print text appears in type that is smaller than the surrounding text:

> **\*Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted service and access; my subscription(s) will be automatically renewed at the end of each subscription term, at the rate then in effect. I authorize you to fulfill my subscription(s) and charge the credit/debit card if provided. I won't be bothered with any renewal notices, instead, I will receive a clearly marked reminder notice with the then current rates about 30 days prior to charging my credit/debit card. I may opt out of the automatic renewal at any time by contacting customer service referenced below and receive a refund for all undelivered issues.

30.   On Exhibit 6, the 6-line paragraph of text that appears near the bottom does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is smaller than the surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

31.   On Exhibit 6, the 6-line paragraph of text that appears near the bottom does not constitute a disclosure of "automatic renewal offer terms," as defined by

§ 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 30, above; (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

32.     Exhibit 6 does not provide a toll-free telephone number, electronic mail address, postal mail address, or other mechanism for cancellation, as required by § 17602(b).  The postal address for customer service for Hearst magazines, including any request to cancel *Food Network Magazine*, is P.O. Box 6000, Harlan, IA 51593. The address set forth at the end of Exhibit 6 (300 W. 57th Street, New York, NY 10019) is the street address of Hearst Tower and is not the postal address for cancellation of magazines.

33.     On September 20, 2018, Nakai received an email from Defendants stating that her payment for *Food Network Magazine* had been received, that the "subscription term" was 11 issues, and that the "expire issue" was November 2019. A true and correct copy of that email is attached hereto as Exhibit 7 and is incorporated herein by reference.

34.     The following year, in December 2019, the invoice payment form for Nakai's account on Defendants' website reflected that there was a "Payment Due" on December 15, 2019 in the amount of $19.97.  A true and correct copy of the invoice payment form for Nakai's account on Defendants' website as it appeared in December 2019 is attached hereto as Exhibit 8 and is incorporated herein by reference.  Near the bottom of Exhibit 8 is a red button with white lettering entitled "PAY NOW."  Just

above that "PAY NOW" button and below the space for entry of credit card information, the following 8-line paragraph of fine-print text appears in blue type that is smaller than the surrounding text:

> **Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted delivery service.  My subscription will be automatically renewed at the end of each subscription term, at the rate then in effect, and I authorize you to charge the credit/debit card I provided.  I won't be bothered with any renewal notices. Instead, I'll receive a clearly marked reminder notice with the then current rate about 30 days prior to charging my credit/debit card.  I may opt out of the automatic renewal at any time by contacting customer service and receive a refund for all undelivered issues.

35.   On Exhibit 8, the 8-line paragraph of text that appears above the PAY NOW button does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because, without limitation, the type is smaller than the surrounding text.

36.   On Exhibit 8, the 8-line paragraph of text that appears above the PAY NOW button does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 35, above; (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

37.   Based on the fact that the invoice payment form for Nakai's account on Defendants' website in December 2019 appeared as shown on Exhibit 8, Nakai is informed and believes and thereon alleges that the invoice payment form for her account as of September 2018, when she paid the $12.00 invoice as alleged above in paragraph 28, was in all material respects the same as the invoice payment form shown on Exhibit 8.  To the extent there were any differences in the invoice payment

form on Defendants' website between September 2018 and December 2019, documents that reflect any such differences are in Defendants' exclusive possession.

38.     Based on the 9-line paragraph of fine-print text that appears above the SUBMIT button on Exhibit 4 (the sweepstakes entry form), as quoted above in paragraph 23, and further based on the 8-line paragraph of fine-print text that appears above the PAY NOW button on Exhibit 8 (the invoice payment page for Nakai's account), as quoted above in paragraph 34, and further based on the fact that, as of December 2019, the invoice payment page for Nakai's account (Exhibit 8) stated that a payment of $19.97 was "due" on December 15, 2019, Nakai alleges that the *Food Network Magazine* subscription into which Defendants enrolled her in September 2018 was created by Defendants as an automatic renewal subscription.

39.     Based on the foregoing, in September 2018, when Nakai submitted her sweepstakes entry form with a request for a "FREE ISSUE" of *Food Network Magazine*, Defendants failed to present the "automatic renewal offer terms" (as defined by § 17601(b)) in a "clear and conspicuous" manner (as defined by § 17601(c)), in violation of § 17602(a)(1).

40.     Based on the foregoing, in September 2018, when Nakai paid the $12.00 invoice through the invoice payment form for her account on Defendants' website, Defendants charged Nakai's credit card without first obtaining her affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms, in violation of § 17602(a)(2).

41.     Based on the foregoing, Defendants failed to provide Nakai with an acknowledgment that included clear and conspicuous notice of automatic renewal offer terms, in violation of § 17602(a)(3), and failed to include in an acknowledgment a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(b).

42.     When Nakai submitted the sweepstakes entry form, she was not aware that Defendants intended to treat that submission as a request for a one-year

subscription or as a request for a subscription that would automatically renew from one period to another.

43.    If Nakai had known that Defendants were going to treat her submission of a sweepstakes entry with a request for a "FREE" issue of *Food Network Magazine* as enrollment into an automatic renewal subscription, she would not have entered the sweepstakes, would not have requested the "FREE" magazine issue, and would not have paid any money to Defendants for *Food Network Magazine*.

44.    When Nakai paid the $12.00 invoice in September 2018 through the invoice payment form on Defendant's website, she was not aware that Defendants intended to treat her payment as authorization to enroll her into an automatic renewal subscription.

45.    If Nakai had known that Defendants were going to treat her payment of the invoice for *Food Network Magazine* as enrollment into an automatic renewal subscription, she would not have paid any money to Defendants for *Food Network Magazine*.

**Fenella Arnold's Transactions**

*HGTV Magazine*

46.    In or about June 2017, in response to one of Defendants' paper advertisements that included an order form to be filled out by the consumer, Arnold completed the form for a two-year subscription to *HGTV Magazine* and returned it to Defendants.  Arnold did not make a copy of the order form before it was returned to Defendants, and therefore Arnold does not have a copy of it.  Because the order form was returned to Defendants, Arnold is informed and believes and thereon alleges that Defendants have the advertisement/order form in their possession, custody, or control.  Therefore, Arnold will seek production of that advertisement/order form from Defendants through discovery.

47.     On June 30, 2017, Arnold received via email an invoice for the two-year subscription to *HGTV Magazine* in the amount of $22.00.  A true and correct copy of that invoice is attached hereto as Exhibit 9.

48.     On July 3, 2017, Defendants charged $22.00 to Arnold's credit card for that two-year subscription to *HGTV Magazine*.

49.     Arnold believes she paid the invoice for *HGTV Magazine* on July 3, 2017 by entering her credit card information in an invoice payment form for her account through Defendants' website.  Arnold did not make a screenshot or print the webpage through which the credit card information was submitted to Defendants, and therefore Arnold does not have a copy of that exact webpage.  However, based on the fact that Defendants maintain on their website invoice payment forms for customer accounts in the format, content, and layout reflected in Exhibit 8, Arnold is informed and believes and thereon alleges that she paid the invoice on an invoice payment form for her account that was in all material respects the same as the invoice payment form shown in Exhibit 8.  To the extent there were any differences in the invoice payment form on Defendants' website between July 2017 and December 2019, documents that reflect any such differences are in Defendants' exclusive possession.

50.     Accordingly, Arnold alleges that on the invoice payment form through which she paid the invoice for *HGTV Magazine*, the paragraph of fine-print text labeled "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because, without limitation, the type is smaller than the surrounding text.

51.     Arnold further alleges that on the invoice payment form through which she paid the invoice for *HGTV Magazine*, the paragraph of fine-print text labeled "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure was not set forth in a manner that is "clear and conspicuous" as explained in the preceding paragraph 50, above; (b) the text did not

state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text did not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text did not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text did not state the length of the automatic renewal term, as required by § 17601(b)(4).

52.     When Arnold submitted the order form and when she made the $22.00 credit card payment for the two-year subscription to *HGTV Magazine*, she was not aware that Defendants were going to enroll her in a program under which the subscription would automatically renew for subsequent periods, and she did not consent to be enrolled in such program.

53.     Based on the foregoing, in June 2017, when Arnold submitted her request for a two-year subscription to *HGTV Magazine*, Defendants failed to present the "automatic renewal offer terms" (as defined by § 17601(b)) in a "clear and conspicuous" manner (as defined by § 17601(c)), in violation of § 17602(a)(1).

54.     Based on the foregoing, in June 2017, when Arnold submitted payment for a two-year subscription to *HGTV Magazine*, Defendants charged Arnold's credit card without first obtaining her affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms, in violation of § 17602(a)(2).

55.     If Arnold had known that Defendants were going to enroll her in an automatically renewing magazine subscription program, Arnold would not have submitted the order for *HGTV Magazine* and would not have paid any money to Defendants for that magazine.

56.     On June 28, 2019, without Arnold's authorization or consent, Defendants posted a charge of $34.97 to Arnold's credit card, purportedly for renewal of *HGTV Magazine*.

1     <u>*Good Housekeeping* and *Woman's Day*</u>

2     57.    In or about November 2018, in response to one of Defendants' paper

3 advertisements that included an order form to be filled out by the consumer, Arnold

4 completed the form and submitted an order for a one-year subscription to both *Good*

5 *Housekeeping* and *Woman's Day*. This was a gift subscription for Arnold's mother,

6 Dorothy. Arnold did not make a copy of the order form before it was returned to

7 Defendants, and therefore Arnold does not have a copy of it. Because the order form

8 was returned to Defendants, Arnold is informed and believes and thereon alleges that

9 Defendants have the advertisement/order form in their possession, custody, or control.

10 Therefore, Arnold will seek production of that advertisement/order form from

11 Defendants through discovery.

12     58.    Although Arnold did not retain a copy of the specific

13 advertisement/order form that she returned to Defendants with respect to *Good*

14 *Housekeeping* and *Woman's Day*, Arnold believes the form was in all material

15 respects the same as the advertisement/order form depicted in Exhibit 10, which is

16 incorporated herein by reference. Exhibit 10 offers a double subscription to *Good*

17 *Housekeeping* and *Woman's Day* for one year for a total of $10.

18     59.    At the bottom of the advertisement/order form shown in Exhibit 10, the

19 following 3-line paragraph of fine-print text appears in type that is smaller than the

20 surrounding text:

21               **Continuous Service Program:** Your subscription will continue unless you ask us to stop. Each year you'll receive a reminder notice followed by an invoice for the low renewal rate then in effect. You can cancel at any time at service.womansday.com and receive a refund on all unmailed issues.

22

23     60.    On Exhibit 10, the 3-line paragraph of text that appears at the bottom of

24 the page does not constitute a "clear and conspicuous" disclosure, as defined by

25 § 17601(c), because: (a) the type is smaller than the surrounding text; (b) the type is

26 not in contrasting type, font, or color to surrounding text of the same size; and (c) it

27 is not set off from surrounding text of the same size by symbols or other marks in a

28 manner that clearly calls attention to the language.

61.     On Exhibit 10, the 3-line paragraph of text that appears at the bottom of the page does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 60, above; and (b) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3).

62.     On November 11, 2018, Arnold received "Order Confirmation" emails from Defendants for the one-year subscriptions to *Good Housekeeping* and *Woman's Day*.  True and correct copies of those emails are attached hereto as Exhibits 11 and 12.  Near the bottom of Exhibits 11 and 12, the following 6-line paragraph of fine-print text appears in type that is smaller than the surrounding text:

> **Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted service and access; my subscription(s) will be automatically renewed at the end of each subscription term, at the rate(s) then in effect. I authorize you to fulfill my subscription(s) and charge the credit/debit card if provided, or send me a bill if not. I won't be bothered with any renewal notices, instead, I will receive a clearly marked reminder notice with the then current rate(s) about 30 days prior to charging my credit/debit card or receiving a bill. I may opt out of the automatic renewal at any time by contacting customer service referenced below and receive a refund for all undelivered issues.

63.     On Exhibits 11 and 12, the 6-line paragraph of text that appears near the bottom does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is smaller than the surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

64.     On Exhibits 11 and 12, the 6-line paragraph of text that appears near the bottom does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 63, above; (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does

not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

65. Exhibits 11 and 12 do not provide a toll-free telephone number, electronic mail address, postal mail address, or other mechanism for cancellation, as required by § 17602(b). The postal address for customer service for Hearst magazines, including any request to cancel *Good Housekeeping* and *Woman's Day*, is P.O. Box 6000, Harlan, IA 51593. The address set forth at the end of Exhibits 11 and 12 (300 W. 57th Street, New York, NY 10019) is the street address of Hearst Tower and is not the postal address for cancellation of magazines.

66. On November 12, 2018, Defendants posted two separate charges of $5.00 each to Arnold's credit card for the one-year subscriptions to *Good Housekeeping* and *Woman's Day*.

67. Arnold believes she paid the invoice for *Good Housekeeping* and *Woman's Day* on November 12, 2018 by entering her credit card information in an invoice payment form for her account through Defendants' website. Arnold did not make a screenshot or print the webpage through which the credit card information was submitted to Defendants, and therefore Arnold does not have a copy of that exact webpage. However, based on the fact that Defendants maintain on their website invoice payment forms for customer accounts in the format, content, and layout reflected in Exhibit 8, Arnold is informed and believes and thereon alleges that she paid the invoice on an invoice payment form for her account that was in all material respects the same as the invoice payment form shown in Exhibit 8. To the extent there were any differences in the invoice payment form on Defendants' website

between November 2018 and December 2019, documents that reflect any such differences are in Defendants' exclusive possession.

68.   Accordingly, Arnold alleges that on the invoice payment form through which she paid the invoice for *Good Housekeeping* and *Woman's Day*, the paragraph of fine-print text labeled "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because, without limitation, the type is smaller than the surrounding text.

69.   Arnold further alleges that on the invoice payment form through which she paid the invoice for *Good Housekeeping* and *Woman's Day*, the paragraph of fine-print text labeled "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure was not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 68, above; (b) the text did not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text did not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text did not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text did not state the length of the automatic renewal term, as required by § 17601(b)(4).

70.   Based on the foregoing, when Arnold submitted her request for one-year subscriptions to *Good Housekeeping* and *Woman's Day* in November 2018, Defendants failed to present the "automatic renewal offer terms" (as defined by § 17601(b)) in a "clear and conspicuous" manner (as defined by § 17601(c)), in violation of § 17602(a)(1).

71.   Based on the foregoing, when Arnold submitted payment for one-year subscriptions to *Good Housekeeping* and *Woman's Day* in November 2018,

Defendants charged Arnold's credit card without first obtaining her affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms, in violation of § 17602(a)(2).

72.    Based on the foregoing, with respect to Arnold's subscriptions to *Good Housekeeping* and *Woman's Day*, Defendants failed to provide Arnold with an acknowledgment that included clear and conspicuous notice of automatic renewal offer terms, in violation of § 17602(a)(3), and failed to include in an acknowledgment a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(b).

73.    When Arnold submitted the order for the one-year subscriptions to *Good Housekeeping* and *Woman's Day*, and when she submitted payment for those subscriptions, she was not aware that Defendants were going to enroll her in a program under which the subscriptions would automatically renew for subsequent periods, and she did not consent to be enrolled in such program.

74.    If Arnold had known that Defendants were going to enroll her in an automatically renewing magazine subscription program, Arnold would not have submitted the orders for *Good Housekeeping* and/or *Woman's Day,* and would not have paid any money to Defendants for those magazines.

75.    On September 20, 2019, without Arnold's authorization or consent, Defendants posted charges of $19.97 and $14.97 to Arnold's credit card, purportedly for renewal of *Good Housekeeping* and *Woman's Day*, respectively.

*Oprah Magazine*

76.    In or about November 2018, in response to one of Defendants' advertisements, Arnold completed an order form and submitted an order for a one-year subscription to *Oprah Magazine*.  Arnold did not retain a copy of the order form before it was submitted to Defendants, and therefore Arnold does not have a copy of it.  Because the order form was submitted to Defendants, Arnold is informed and believes and thereon alleges that Defendants have a copy of the advertisement/order

1   form in their possession, custody, or control.  Therefore, Arnold will seek production

2   of that advertisement/order form from Defendants through discovery.

3      77.   When Arnold submitted the order for that one-year subscription to

4   *Oprah Magazine*, she was not aware that Defendants were going to enroll her in a

5   program under which the subscription would automatically renew for subsequent

6   periods, and she did not consent to be enrolled in such program.  On that basis, Arnold

7   is informed and believes and thereon alleges that the advertisement/order form to

8   which she responded did not contain clear and conspicuous disclosure of automatic

9   renewal offer terms as required by § 17601(b) and (c) and § 17602(a)(1).  Arnold

10  believes this allegation will likely have documentary support after a reasonable

11  opportunity for discovery.

12     78.   On November 11, 2018, Arnold received an "Order Confirmation" email

13  from Defendants for the one-year, $5.00 subscription to *Oprah Magazine*.  A true and

14  correct copy of that email is attached hereto as Exhibit 13 and is incorporated herein

15  by reference.  Near the bottom of Exhibit 13, the following 6-line paragraph of fine-

16  print text appears in type that is smaller than the surrounding text:

17  **\*Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted service and
    access; my subscription(s) will be automatically renewed at the end of each subscription term, at the rate(s) then in effect.

18  I authorize you to fulfill my subscription(s) and charge the credit/debit card if provided, or send me a bill if not. I won't
    be bothered with any renewal notices, instead, I will receive a clearly marked reminder notice with the then current rate(s)
    about 30 days prior to charging my credit/debit card or receiving a bill. I may opt out of the automatic renewal at any time

19  by contacting customer service referenced below and receive a refund for all undelivered issues.

20     79.   On Exhibit 13, the 6-line paragraph of text that appears near the bottom

21  does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c),

22  because: (a) the type is smaller than the surrounding text; (b) the type is not in

23  contrasting type, font, or color to surrounding text of the same size; and (c) it is not

24  set off from surrounding text of the same size by symbols or other marks in a manner

25  that clearly calls attention to the language.

26     80.   On Exhibit 13, the 6-line paragraph of text near the bottom does not

27  constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b),

28  for at least the following reasons: (a) the disclosure is not set forth in a manner that is

"clear and conspicuous," as explained in the preceding paragraph 79, above; and (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

81.    Exhibit 13 does not provide a toll-free telephone number, electronic mail address, postal mail address, or other mechanism for cancellation, as required by § 17602(b).  The postal address for customer service for Hearst magazines, including any request to cancel *Oprah Magazine*, is P.O. Box 6000, Harlan, IA 51593.  The address set forth at the end of Exhibit 13 (300 W. 57th Street, New York, NY 10019) is the street address of Hearst Tower and is not the postal address for cancellation of magazines.

82.    On November 12, 2018, Defendants charged $5.00 to Arnold's credit card for the one-year subscription to *Oprah Magazine*.  Arnold believes she paid the invoice for *Oprah Magazine* on November 12, 2018 by entering her credit card information in an invoice payment form for her account through Defendants' website.  Arnold did not make a screenshot or print the webpage through which the credit card information was submitted to Defendants, and therefore Arnold does not have a copy of that exact webpage.  However, based on the fact that Defendants maintain on their website invoice payment forms for customer accounts in the format, content, and layout reflected in Exhibit 8, Arnold is informed and believes and thereon alleges that she paid the invoice on an invoice payment form for her account that was in all material respects identical to the invoice payment form shown in Exhibit 8.  To the extent there were any differences in the invoice payment form on Defendants' website

1 between November 2018 and December 2019, documents that reflect any such
2 differences are in Defendants' exclusive possession.

3      83.   Accordingly, Arnold alleges that on the invoice payment form through
4 which she paid the invoice for *Oprah Magazine*, the paragraph of fine-print text
5 labeled "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a
6 "clear and conspicuous" disclosure, as defined by § 17601(c), because, without
7 limitation, the type is smaller than the surrounding text.

8      84.   Arnold further alleges that on the invoice payment form through which
9 she paid the invoice for *Oprah Magazine*, the paragraph of fine-print text labeled
10 "Continuous Service Program" (as quoted above in paragraph 34) did not constitute a disclosure
11 of "automatic renewal offer terms," as defined by § 17601(b), for at least the
12 following reasons: (a) the disclosure was not set forth in a manner that is "clear and
13 conspicuous," as explained in the preceding paragraph 83, above; (b) the text did not
14 state that a subscription or purchasing agreement will continue until the consumer
15 cancels, as required by § 17601(b)(1); (c) the text did not describe a cancellation
16 policy that applies to the offer, as required by § 17601(b)(2); (d) the text did not state
17 the amount of the recurring charges that will be charged to the consumer's credit or
18 debit card or payment account with a third party as part of the automatic renewal plan
19 or arrangement, as required by § 17601(b)(3); and/or (e) the text did not state the
20 length of the automatic renewal term, as required by § 17601(b)(4).

21      85.   Based on the foregoing, when Arnold submitted her request for a one-
22 year subscription to *Oprah Magazine* in November 2018, Defendants failed to present
23 the "automatic renewal offer terms" (as defined by § 17601(b)) in a "clear and
24 conspicuous" manner (as defined by § 17601(c)), in violation of § 17602(a)(1).

25      86.   Based on the foregoing, when Arnold submitted payment for the one-
26 year subscription to *Oprah Magazine* in November 2018, Defendants charged
27 Arnold's credit card without first obtaining her affirmative consent to an agreement
28 containing clear and conspicuous disclosure of automatic renewal offer terms, in

violation of § 17602(a)(2).

87. Based on the foregoing, with respect to Arnold's subscription to *Oprah Magazine*, Defendants failed to provide Arnold with an acknowledgment that included clear and conspicuous notice of automatic renewal offer terms, in violation of § 17602(a)(3), and failed to include in an acknowledgment a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(b).

88. When Arnold submitted the order for the one-year subscription to *Oprah Magazine*, and when she submitted payment for that subscription, she was not aware that Defendants were going to enroll her in a program under which the subscription would automatically renew for subsequent periods, and she did not consent to be enrolled in such program.

89. If Arnold had known that Defendants were going to enroll her in an automatically renewing magazine subscription program, Arnold would not have submitted the order for *Oprah Magazine* and would not have paid any money to Defendants for that magazine.

90. On October 11, 2019, without Arnold's authorization or consent, Defendants posted a charge of $34.97 to Arnold's credit card, purportedly for renewal of *Oprah Magazine*.

**Michele Ruppert's Transaction**

91. In or about July 2018, Ruppert received in the mail a notice from Defendants that Ruppert was entitled to a "credit adjustment" in the amount of $39.91, which qualified her to receive a one-year subscription to *Food Network Magazine* for $9.99 as well as the opportunity to add a one-year subscription to *HGTV Magazine* for "just $2!" The "credit adjustment" offer was provided to Ruppert as a single piece of paper, double-sided. A true and correct copy of that offer is attached hereto as Exhibit 14 (the second page of which is the reverse side of the paper offer).

92.     On the front page of Exhibit 14, on the right side of the page and approximately one-third of the way down, the following 3-line paragraph of fine-print text appears in type that is smaller than the surrounding text:

**Continuous Service Program:** Your subscription will continue unless you ask us to stop. Each year you'll receive a reminder notice followed by an invoice for the low renewal rate then in effect. You can cancel at any time and receive a refund on all unmailed issues. See back for details.

93.     On Exhibit 14, that 3-line paragraph of text that appears on the front side does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is smaller than the surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

94.     On Exhibit 14, that 3-line paragraph of text that appears on the front side does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 93, above; and (b) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3).

95.     On Exhibit 14, there is mention of automatic renewal or continuous service on the reverse side of the page (Exhibit 14 at p. 33).  On that reverse side, there are five numbered paragraphs, as follows:

**1. Guaranteed Savings.**  You lock in guaranteed savings off the cover price this year and every year – as long as you remain a subscriber.

**2. Guaranteed Hassle-Free Service.** You enjoy our guaranteed convenient service. There are no more renewal notices because we do all the work for you by continuing your subscription automatically each term.

**3. Guaranteed Uninterrupted Delivery.** You're guaranteed the ease and convenience of uninterrupted home delivery.  Your subscription will renew automatically at the end of its term unless you tell us to stop. At the end of your subscription term, we will send you a reminder, followed by a bill for the renewal subscription term at the low renewal rate then in effect.

**4. Guaranteed Right to Cancel Anytime.** You'll always be notified at least 30 days in advance of your subscription expiration with a report of what your savings will be for the next term. If you ever wish to cancel, simply contact us at P.O. Box 6000, Harlan, IA 51593-1500 and get a full refund on all unmailed issues.

**5. Money-Back Guarantee.**  We guarantee that you may call or write to cancel your subscription upon request at any time and that you will receive any money you may have paid for all copies still outstanding.

25

96.     On Exhibit 14, page 33, the allusion to automatic renewal or continuous service in the paragraphs numbered 2 and 3 (quoted above) does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is not larger than surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

97.     Exhibit 14, page 33, does not does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 96, above; (b) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (c) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

98.     On the front page of Exhibit 14, there is a notice that for "faster service," a consumer can "order online at: credit.foodnetworkmag.com."  Entering that URL into a browser generates a webpage offering a one-year subscription to *Food Network Magazine* for $9.99 with an optional one-year subscription to *HGTV Magazine* for "JUST $2 MORE!"   A true and correct copy of that offer page, https://subscribe.hearstmags.com/subscribe/splits/foodnetmag/fnm_redir_credit, (last accessed July 24, 2020) is attached hereto as Exhibit 15 and is incorporated herein by reference.   On July 25, 2018, Ruppert accessed the URL credit.foodnetworkmag.com, entered her credit card information, and submitted a subscription order for both magazines.

99.     Ruppert is informed and believes and thereon alleges that the offer page shown in Exhibit 15 is in all material respects the same as the offer page through which she submitted the subscription order on July 25, 2018.  To the extent there were

26

1   any differences between the offer page shown in Exhibit 15 and the offer page as it

2   existed on July 25, 2018 when Ruppert submitted her order, such differences are in

3   Defendants' exclusive possession.

4       100.   On Exhibit 15, above the "PLACE ORDER" button, the following 8-line

5   paragraph of fine-print text appears in faint bluish type that is smaller than the

6   surrounding text:

7   **Continuous Service Program:** I understand that unless I tell you otherwise, I will receive
    uninterrupted service and access; my subscription(s) will be automatically renewed at the end of
    each subscription term, at the rate(s) then in effect.  I authorize you to fulfill my subscription(s) and

8   charge the credit/debit card if provided, or send me a bill if not.  I won't be bothered with any renewal
    notices, instead, I will receive a clearly marked reminder notice with the then current rate(s) about
    30 days prior to charging my credit/debit card or receiving a bill.  I may opt out of the automatic

9   renewal at any time by contacting customer service referenced below and receive a refund for all
    undelivered issues.

10       101.   On Exhibit 15, the 8-line paragraph of text that appears above the

11   PLACE ORDER button does not constitute a "clear and conspicuous" disclosure, as

12   defined by § 17601(c), because: (a) the type is smaller than surrounding text; (b) the

13   type is not in contrasting type, font, or color to surrounding text of the same size; and

14   (c) it is not set off from surrounding text of the same size by symbols or other marks

15   in a manner that clearly calls attention to the language.

16       102.   On Exhibit 15, the 8-line paragraph of text that appears above the

17   PLACE ORDER button does not constitute a disclosure of "automatic renewal offer

18   terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure

19   is not set forth in a manner that is "clear and conspicuous," as explained in the

20   preceding paragraph 101, above; (b) the text does not state that a subscription or

21   purchasing agreement will continue until the consumer cancels, as required by

22   § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the

23   offer, as required by § 17601(b)(2); (d) the text does not state the amount of the

24   recurring charges that will be charged to the consumer's credit or debit card or

25   payment account with a third party as part of the automatic renewal plan or

26   arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length

27   of the automatic renewal term, as required by § 17601(b)(4).

28

103.   On July 25, 2018, Ruppert received "Order Confirmation" emails from Defendants for the one-year, $9.99 subscription to *Food Network Magazine* and the one-year, $2.00 subscription to *HGTV Magazine*.   True and correct copies of those emails are attached hereto as Exhibits 16 and 17, respectively.

104.   Near the bottom of Exhibits 16 and 17, the following 6-line paragraph of fine-print text appears in type that is smaller than the surrounding text:

> **\*Continuous Service Program:** I understand that unless I tell you otherwise, I will receive uninterrupted service and access; my subscription(s) will be automatically renewed at the end of each subscription term, at the rate then in effect. I authorize you to fulfill my subscription(s) and charge the credit/debit card if provided. I won't be bothered with any renewal notices, instead, I will receive a clearly marked reminder notice with the then current rates about 30 days prior to charging my credit/debit card.  I may opt out of the automatic renewal at any time by contacting customer service referenced below and receive a refund for all undelivered issues.

105.   On Exhibits 16 and 17, the 6-line paragraph of text that appears near the bottom does not constitute a "clear and conspicuous" disclosure, as defined by § 17601(c), because: (a) the type is smaller than surrounding text; (b) the type is not in contrasting type, font, or color to surrounding text of the same size; and (c) it is not set off from surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language.

106.   On Exhibits 16 and 17, the 6-line paragraph of text near the bottom does not constitute a disclosure of "automatic renewal offer terms," as defined by § 17601(b), for at least the following reasons: (a) the disclosure is not set forth in a manner that is "clear and conspicuous," as explained in the preceding paragraph 105, above; and (b) the text does not state that a subscription or purchasing agreement will continue until the consumer cancels, as required by § 17601(b)(1); (c) the text does not describe a cancellation policy that applies to the offer, as required by § 17601(b)(2); (d) the text does not state the amount of the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, as required by § 17601(b)(3); and/or (e) the text does not state the length of the automatic renewal term, as required by § 17601(b)(4).

107.   Exhibits 16 and 17 do not provide a toll-free telephone number, electronic mail address, postal mail address, or other mechanism for cancellation, as required by § 17602(b).   The postal address for customer service for Hearst magazines, including any request to cancel *Food Network Magazine* and *HGTV Magazine*, is P.O. Box 6000, Harlan, IA 51593.   The address set forth at the end of Exhibits 16 and 17 (300 W. 57th Street, New York, NY 10019) is the street address of Hearst Tower and is not the postal address for cancellation of magazines.

108.   Based on the foregoing, when Ruppert submitted her request for one-year subscriptions to *Food Network Magazine* and *HGTV Magazine*, Defendants failed to present the "automatic renewal offer terms" (as defined by § 17601(b)) in a "clear and conspicuous" manner (as defined by § 17601(c)), in violation of § 17602(a)(1).

109.   Based on the foregoing, when Ruppert submitted her request for one-year subscriptions to *Food Network Magazine* and *HGTV Magazine*, Defendants charged Ruppert's credit card without first obtaining her affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms, in violation of § 17602(a)(2).

110.   Based on the foregoing, with respect to Ruppert's subscriptions to *Food Network Magazine* and *HGTV Magazine*, Defendants failed to provide Ruppert with an acknowledgment that included clear and conspicuous notice of automatic renewal offer terms, in violation of § 17602(a)(3), and failed to include in an acknowledgment a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(b).

111.   When Ruppert submitted the order and credit card payment for the one-year subscriptions to *Food Network Magazine* and *HGTV Magazine,* she was not aware that Defendants were going to enroll her in a program under which the subscriptions would automatically renew for subsequent periods, and she did not consent to be enrolled in such program.

112. If Ruppert had known that Defendants were going to enroll her in an automatically renewing magazine subscription program, Ruppert would not have submitted the order for *Food Network Magazine* or *HGTV Magazine* and would not have paid any money to Defendants for either magazine.

113. On April 5, 2019, without Ruppert's authorization or consent, Defendants posted a charge of $34.97 to Ruppert's credit card, purportedly for renewal of *HGTV Magazine*.

114. On May 17, 2019, without Ruppert's authorization or consent, Defendants posted a charge of $29.97 to Ruppert's credit card, purportedly for renewal of *Food Network Magazine*.

**Defendants' Possession of Relevant Transaction Records**

115. This action was initially filed in the San Diego County Superior Court on September 10, 2019, and Defendants removed the action to this Court on October 10, 2019. ECF No. 1. Plaintiffs filed a First Amended Complaint ("FAC") on December 9, 2019. ECF No. 14.

116. On December 18, 2019, Defendants represented to the Court that the usual 14-day period for a response to the FAC "was not enough time ***to retrieve and analyze the transaction records***, investigate the new allegations, and develop a response[.]" ECF No. 15 at PageID 302 (emphasis added); No. 15-1 at Page ID 305. Defendants' counsel further explained that the impending holidays and other work commitments "will prevent him from devoting adequate time to investigating Plaintiffs' allegations within the next two to three weeks." (*Ibid*.) Those statements give rise to a reasonable inference that Defendants have in their possession, custody, or control all records relating to Plaintiffs' transactions. Such an inference is further supported by the fact that, when it served their interests to do so, Defendants were able to provide the Court with a "more legible copy" of the sweepstakes order form submitted by Nakai. *See* ECF No. 17-1 at PageID.322. In short, Defendants provide transaction records when it suits them, but otherwise they plead ignorance.

117.   Based on the foregoing, with respect to Nakai's transaction, Defendants have in their possession, custody, and control the invoice payment form as it existed when Nakai paid the invoice in September 2018, and any order confirmation email provided to Nakai with respect to *Food Network Magazine*.  Based on similar documents that are exhibits to this Complaint, such records likely consist of two pages.

118.   Based on the foregoing, with respect to Arnold's transactions, Defendants have in their possession, custody, and control the advertisements to which Arnold responded and the orders forms she submitted to Defendants for *HGTV Magazine*, *Good Housekeeping*, *Woman's Day*, and *Oprah Magazine*; the invoice payment forms as they existed when Arnold made her credit card payments in July 2017 and November 2018; and any order confirmation email provided in connection with Arnold's subscription for *HGTV Magazine*.  Based on similar documents that are exhibits to this Complaint, such records likely consist of approximately seven pages.

119.   Based on the foregoing, with respect to Ruppert's transaction, Defendants have in their possession, custody, and control the offer page/payment form as it existed on the date Ruppert submitted her subscription order and payment for *Food Network Magazine* and *HGTV Magazine*.  Based on a similar document that is an exhibit to this Complaint, such record likely consists of one page.

### **BUSINESS PRACTICES APPLIED TO OTHER CONSUMERS**

120.   Plaintiffs are not the only consumers to be victimized by Defendants' business practices in connection with magazine subscriptions.  There are numerous consumer complaints about Defendants' practices posted on a variety of websites, including but not limited to the Better Business Bureau ("BBB"), Yelp, Complaints Board, and pissedconsumer.com.

121.   Customer reviews of Hearst posted on the BBB website and other consumer websites illustrate that Defendants' business practices have affected many

31

consumers, some of whom report receiving invoices from Defendants when no payment is due and/or being automatically renewed for magazines without consent. Illustrative reviews or complaints are quoted below:

> **DeborahA (January 6, 2020).**  I originally ordered a one-year subscription about 12 months ago.  On my most recent credit card statement, I noticed that, without my consent or authorization, the company automatically billed me for a two-year renewal of Food Network Magazine.

A true and correct printout of that complaint is attached as Exhibit 18.

> **Elizabeth S (December 17, 2019).**  I subscribed for a one year subscription and made the mistake of providing them with my debit card info.  To date, MORE THAN A YEAR LATER, they have charged me numerous times, always different amounts without ever giving me the option to renew or opt out.  On top of that, I tried to locate their phone # with no success as it wasn't listed in the magazine so I couldn't cancel the subscription.  I had to call my bank and cut them at the source which was very inconvenient as my debit card number had to be changed and all my automatic accounts had to be updated.  DO NOT ORDER/SUBSCRIBE TO ANYTHING FROM THIS COMPANY!!!!!

A true and correct printout of that complaint is attached as Exhibit 19.

> **Laura H (March 30, 2019).**  I subscribed to 1 year of Town and Country magazine. I did NOT renew it and keep receiving "invoices" stating my "account" is overdue for another year subscription.  They use bullying tactics to make people believe they owe this "manufactured" invoice.  Warning to the elderly or uninformed.  DO NOT PAY THESE INVOICES OR BE INTIMIDATED BY THEIR QUESTIONABLE TACTICS!

A true and correct printout of that complaint is attached as Exhibit 20.

> **Cathy H (January 18, 2019).**  Scam!!!  Entered their sweepstakes and than [sic] received an E-mail with a subscription to *** Magazine and no way to unsubscribe.  Now they are sending a bill to me via mail!!! I never ordered there [sic] magazine!!! sweepstakes is just a scam to get subscriptions and money from innocent people!

A true and correct printout of that complaint is attached as Exhibit 21.

> **Advertising/Sales Issues (August 20, 2018).**  Hearstmags and Good Housekeeping and Oprah or O magazine, are all connected to the Hearst Corporation.  Unsuspecting people (like myself), enter a cloaked sweepstakes and the next thing you know you start getting be e-mail and postage mail invoices saying you owe them money for agreeing to buy one of these magazine subscriptions to Good Housekeeping and the Oprah O magazines.  Fraudulent entrapment advertising and it may be their way for you to un-enter their sweepstakes also.  Clever but unethical and fraudulent.

32

A true and correct printout of that complaint is attached as Exhibit 22.

**Billing/Collection Issues (January 8, 2018).** I hope Woman's Day is reading this because I got a subscription that I don't want; probably got because I entered a sweepstakes and inadvertently said "yes" somewhere in the process! (Very sneaky). They don't have a phone # on the invoice, can't find it online. When you go to their customer service page they want all kinds of information from you; you have to log in, etc. etc. This takes way too much time to have to "undo" something which I didn't want in the first place. Since I can't get in touch with a "human", I'm putting this on Facebook, and complaining to BBB. Address on invoice: ** *** ****** ***** ** **********.

A true and correct printout of that complaint is attached as Exhibit 23.

**Advertising/Sales Issues (May 8, 2017).** I filled out an online form for a "Garage Make-Over" sweepstakes type of advertisement on Facebook. The next day I received an email saying I owe Car & Driver $10! First I tried finding a contact avenue for Car and Driver...there is none unless you are a subscriber. I found a way to contact the editor online for Car and Driver I told them in so uncertain terms that I DO NOT want a subscription to Car and Driver I never wanted a subscription to Car and Driver and to stop contacting me about a subscription to Car and Driver. Now Car and driver is sending me mail demanding their $10 for a subscription that was gained by FALSE ADVERTISEMENT online. Please let Hearst Communications know that I've communicated I DO NOT WANT A SUBSCRIPTION TO CAR AND DRIVER!!

A true and correct printout of that complaint is attached as Exhibit 24.

## CLASS ACTION ALLEGATIONS

122.   Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class defined as follows: "All individuals in California who, within the applicable limitations period, were enrolled by Defendants in an automatic renewal program or a continuous service program and had a credit card, debit card, and/or a third-party payment account charged by Defendants as part of such program. Excluded from the Class are all employees of Defendants, all employees of Plaintiffs' counsel, and the judicial officers to whom this case is assigned."

123.   <u>Ascertainability</u>. The members of the Class may be ascertained by reviewing records in the possession of Defendants and/or third parties, including without limitation Defendants' marketing and promotion records, customer records,

and billing records.

124. <u>Common Questions of Fact or Law</u>.  There are questions of fact or law that are common to the members of the Class, which predominate over individual issues.   Common questions regarding the Class include, without limitation: (1) whether Defendants present all automatic renewal offer terms, within the meaning of § 17601(b); (2) whether Defendants present automatic renewal offer terms in a manner that is "clear and conspicuous," within the meaning of § 17601(c), and in visual proximity to a request for consent to the offer (or in the case of an offer conveyed by voice, in temporal proximity to a request for consent to the offer), as required by § 17602(a)(1); (3) whether, before charging a credit card, debit card, or third-party payment account, Defendants obtain consumers' affirmative consent to an agreement containing clear and conspicuous disclosure of all automatic renewal offer terms, as required by § 17602(a)(2); (4) whether Defendants provide consumers with an acknowledgment that includes clear and conspicuous disclosure of all statutorily-mandated automatic renewal or continuous service offer terms, the cancellation policy, and information regarding how to cancel, as required by § 17602(a)(3); (5) Defendants' record-keeping practices;   (6) the appropriate remedies for Defendants' conduct; and (7) the appropriate terms of an injunction.

125. <u>Numerosity</u>.  The Class is so numerous that joinder of all Class members would be impracticable.  Plaintiffs are informed and believe and thereon allege that the Class consists of at least 100 members.

126. <u>Typicality and Adequacy</u>.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs allege on information and belief that Defendants enrolled Class members in automatic renewal or continuous service offer programs without presenting the applicable terms in the manner required by law, charged Class members' credit cards, debit cards, or third-party accounts without first obtaining the Class members' affirmative consent to an agreement containing clear and conspicuous disclosure of all automatic renewal offer terms, and failed to provide the

requisite acknowledgment to Class members.  Plaintiffs have no interests that are adverse to those of the other Class members.  Plaintiffs will fairly and adequately protect the interests of the Class members.

127.  <u>Superiority</u>.  A class action is superior to other methods for resolving this controversy.  Because the amount of restitution or damages to which each Class member may be entitled is low in comparison to the expense and burden of individual litigation, it would be impracticable for class members to redress the wrongs done to them without a class action forum.  Furthermore, on information and belief, class members do not know that their legal rights have been violated.  Class certification would also conserve judicial resources and avoid the possibility of inconsistent judgments.

128.  <u>Defendants Have Acted on Grounds Generally Applicable to the Class</u>. Defendants have acted on grounds that are generally applicable to the members of each class, thereby making appropriate final injunctive relief and/or declaratory relief with respect to each class as a whole.

**FIRST CLAIM FOR RELIEF**

False Advertising

(Bus. & Prof. Code §§ 17600 et seq. and 17535)

129.  Plaintiffs incorporate the previous allegations as though set forth herein.

130.  During the applicable statute of limitations period, Defendants have enrolled consumers, including Plaintiffs and Class members, in automatic renewal programs and/or continuous service programs and have (a) failed to present the automatic renewal or continuous service offer in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer, in violation of § 17602(a)(1); (b) charged the consumer's credit or debit card or the consumer's third-party payment account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to an

agreement containing clear and conspicuous disclosure of the automatic renewal offer terms or continuous service offer terms, in violation of § 176029a)(2); and (c) failed to provide an acknowledgment that includes the required clear and conspicuous disclosure of automatic renewal or continuous service offer terms, cancellation policy, information regarding how to cancel, and a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(a)(3) and § 17602(b).

131.   Plaintiffs have suffered injury in fact and lost money or property as a result of Defendants' violations of the ARL.

132.   Pursuant to § 17603, all goods received by Plaintiffs and Class members are deemed to be an unconditional gift.

133.   Pursuant to § 17535, Plaintiffs and Class members are entitled to restitution of all amounts that Defendants charged to Plaintiffs' and Class members' credit cards, debit cards, or third-party payment accounts during the four years preceding the filing of the initial Complaint in this action and continuing until Defendants' statutory violations cease.

134.   Unless enjoined and restrained by this Court, Defendants will continue the unlawful conduct alleged herein.  Pursuant to § 17535, Plaintiffs seek a public injunction for the benefit of the general public of the State of California.

## SECOND CLAIM FOR RELIEF

### Violation of the Consumers Legal Remedies Act

### (Civ. Code § 1750 et seq.)

135.   Plaintiffs incorporate paragraphs 1-128 as though set forth herein.

136.   Plaintiffs and Class members are "consumers" within the meaning of Civil Code § 1761(d) in that the goods and/or services sought or acquired were for personal, family, or household purposes.

137.   Defendants' magazine and/or subscription offers pertain to "goods" and/or "services" within the meaning of Civil Code § 1761(a) and (b).

138. The requests, orders, and/or payments by Plaintiffs and Class members for Defendants' magazines are "transactions" within the meaning of Civil Code § 1761(e).

139. By engaging in the conduct alleged herein, Defendants have represented that Defendants' goods and services have certain characteristics that they do not have, in violation of Civil Code § 1770(a)(5). For example, and without limitation, Defendants have represented that magazine subscriptions are for a set price and for a limited term with a specific end date when, in fact, Defendants consider the subscriptions to be subject to automatic renewal and additional charges for subsequent periods.

140. By engaging in the conduct alleged herein, Defendants have advertised goods and services with the intent not to sell them as advertised, in violation of Civil Code § 1770(a)(9). For example, and without limitation, Defendants have advertised magazine subscriptions for a set price and for a limited term when, in fact, Defendants intend to enroll consumers who respond to such advertisements in subscriptions that automatically renew and result in additional charges for subsequent periods.

141. By engaging in the conduct alleged herein, Defendants have made false and misleading statements of fact concerning the reasons for, existence of and amounts of price reductions, in violation of Civil Code § 1770(a)(13). For example and without limitation, Defendants have offered discounted prices for magazine subscriptions that purport to be for a set price and for a limited term without disclosing that the discounted price is offered because Defendants intend to enroll consumers who respond in subscriptions that automatically renew and result in additional charges for subsequent periods.

142. By engaging in the conduct alleged herein, Defendants have represented that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law, in violation of Civil Code § 1770(a)(14). For example, and without limitation, Defendants have represented that

magazine subscriptions involve an obligation on the part of the consumer to pay only a set price for a limited term, whereas Defendants enroll the consumer in a subscription that Defendants contend entails an obligation on the part of the consumer to pay additional charges for subsequent periods unless and until the consumer notifies Defendants that the consumer wants to cancel.

143.   By engaging in the conduct alleged herein, Defendants have represented that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, in violation of Civil Code § 1770(a)(17). For example, and without limitation, Defendants have represented that consumers will receive a discounted prices for magazine subscriptions that purport to be for a set price and for a limited term when, in fact, such discount is contingent on Defendants' enrolling the consumers in subscriptions that automatically renew and result in additional charges for subsequent periods.

144.  Defendants' conduct alleged herein was undertaken knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of Civil Code § 3294(c).

145.   On September 12, 2019, Plaintiffs' counsel sent to Hearst and to CDS written notice of the alleged violations of Civil Code § 1770 and requested that Hearst and CDS rectify the violations.  The written notices were sent by certified mail, return receipt requested, and were delivered to Hearst's agent for service of process (The Corporation Trust Company) on September 17, 2019, and to CDS's agent for service of process (CT Corporation) on September 16, 2019.  Neither Hearst nor CDS responded to the written notice.  Accordingly, pursuant to Civil Code § 1782, Plaintiffs have fulfilled the statutory prerequisite to seek monetary damages for violations of the CLRA.

146.   Pursuant to Civil Code § 1780(a)(1), (a)(3), and (a)(4), Plaintiffs are entitled to recover actual damages, restitution, and punitive damages.

147.   Pursuant to Civil Code § 1780(a)(2), Plaintiffs seek a public injunction prohibiting Defendants from continuing their unlawful practices in violation of the Consumers Legal Remedies Act, as described above.

### THIRD CLAIM FOR RELIEF

Unfair Competition

(Bus. & Prof. Code § 17200 et seq.)

148.   Plaintiffs incorporate the previous allegations as though set forth herein.

149.   The California Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.*, defines unfair competition as including "any unlawful, unfair or fraudulent business act or practice," "any "unfair, deceptive, untrue or misleading advertising," and any prohibited by Chapter 1 of the FAL.

150.   In the course of conducting business within the applicable limitations period, Defendants committed "unlawful" business practices that violate the ARL, including without limitation: (a) failing to present the terms of automatic renewal or continuous service offers in a clear and conspicuous manner before a subscription or purchasing agreement is fulfilled and in visual proximity to a request for consent to the offer, in violation of § 17602(a)(l); (b) charging the consumer's credit or debit card or the consumer's third-party payment account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, in violation of § 17602(a)(2); (c) failing to provide an acknowledgment that includes the required clear and conspicuous disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel, in violation of Bus. & Prof. Code § 17602(a)(3); and/or (d) failing to provide an acknowledgment that includes a toll-free telephone number, electronic mail address, postal address, or other mechanism for cancellation, in violation of § 17602(b).

151.   In the course of conducting business within the applicable limitations

39

period, Defendants committed "unlawful" business practices that violate the CLRA, including without limitation: (a) representing that Defendants' goods and services have certain characteristics that they do not have, in violation of Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Civil Code § 1770(a)(9); (c) making false and misleading statements of fact concerning the reasons for, existence of and amounts of price reductions, in violation of Civil Code § 1770(a)(13); (d) representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law, in violation of Civil Code § 1770(a)(14); and/or (e) representing that the consumer will receive a discount or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, in violation of Civil Code § 1770(a)(17). Plaintiffs reserve the right to allege other violations of law that constitute unlawful or unfair business acts or practices.

152.   Defendants' business practices alleged herein also constitute conduct that is "unfair" within the meaning of the UCL.  Defendants' acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

153.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

154.   Defendants' business practices alleged herein also constitute conduct that is misleading and likely to deceive reasonable consumers, and is therefore "fraudulent" within the meaning of the UCL.

155.   Plaintiffs have suffered injury in fact and lost money as a result of Defendants' acts of unfair competition.

156.   Pursuant to § 17203, Plaintiffs and the Class members are entitled to an order requiring Defendants to make restitution of all amounts received in connection with the unlawful, unfair, and/or fraudulent business practices alleged above.

157.   Pursuant to § 17203, for the benefit of the general public of the State of California, Plaintiffs seek a public injunction enjoining Defendants from committing acts of unfair competition as alleged herein.

## **FOURTH CLAIM FOR RELIEF**

### Unjust Enrichment

158.   Plaintiffs incorporate the previous allegations as though set forth herein.

159.   Defendants have received money from Plaintiffs and Class members in connection with Defendants' conduct in violation of California law.  Defendants would be unjustly enriched if they were permitted to retain those funds, and Defendants should be ordered to restore said funds to Plaintiffs and the Class members.

160.   Plaintiffs allege this unjust enrichment claim in the alternative to relief provided under any legal claim alleged herein.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

On the First Claim for Relief:

1.   For restitution;

2.   For an order that all goods sent to Plaintiffs and Class members are unconditional gifts;

3.   For a public injunction for the benefit of the People of the State of California;

On the Second Claim for Relief:

4.   For an award of actual damages, pursuant to Civil Code § 1780(a)(1);

5.   For a public injunction for the benefit of the People of the State of California;

41

6.      For restitution, pursuant to Civil Code § 1780(a)(3);

7.      For punitive damages, pursuant to Civil Code § 1780(a)(4);

8.      For an award of attorneys' fees and costs pursuant to Civil Code § 1780(e);

On the Third Claim for Relief:

9.      For restitution;

10.     For a public injunction for the benefit of the People of the State of California;

On the Fourth Claim for Relief:

11.     For restitution;

On All Claims for Relief:

12.     For an award of attorneys' fees pursuant to Code Civ. Proc. § 1021.5;

13.     For costs of suit;

14.     For pre-judgment interest; and

15.     For such other relief that the Court deems just and proper.


DATED:  September 18, 2020            DOSTART HANNINK & COVENEY LLP


                                     s/ Zach P. Dostart
                                     _____
                                     ZACH P. DOSTART
                                     Attorneys for Plaintiffs
                                     Email: zdostart@sdlaw.com

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury of all claims and causes of action so triable.

DATED: September 18, 2020          DOSTART HANNINK & COVENEY LLP

s/ Zach P. Dostart
ZACH P. DOSTART
Attorneys for Plaintiffs
Email: zdostart@sdlaw.com

923734.3

SECOND AMENDED COMPLAINT                                    Case No. 3:19-cv-01969-WQH-MDD